IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY MATEJEVICH,         )
                                 )
         Plaintiff,       )
                                 )
      v.                  )       2:14cv464
                                 )       Magistrate Judge Lisa Lenihan
**CAROLYN W. COLVIN**, Acting  )
Commissioner of Social Security,  )
                                 )
         Defendant.     )

## OPINION

### I.    INTRODUCTION

Mary Matejevich ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 1381-1382f. Presently before the court are cross-motions for summary judgment. The record has been developed at the administrative level. For the reasons set forth below, plaintiff's motion will be denied, the Commissioner's motion will be granted, and final judgment will be entered in favor of the Commissioner and against plaintiff.

### II.    STATEMENT OF THE CASE

### A.    Procedural History

Plaintiff filed an application for disability benefits on March 20, 2011 alleging disability since December 24, 2010. R. 14. The application was denied on August 10, 2011. R. 98-102. A hearing was held before an ALJ on August 9, 2012. R. 31-85. Plaintiff, represented by

counsel, appeared and testified. R. 35-75, 79-85. An impartial vocational expert, Mark Heckman, also testified. R. 75-79. The ALJ rendered a decision on September 13, 2012, denying plaintiff's application. R. 14-26. On March 11, 2014, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final ruling of the Commissioner. R. 1-6. This civil action followed.

###### B. General Background

Plaintiff was born on July 7, 1959, making her fifty-one years of age on her alleged on-set date of disability and fifty-three years of age at the time of the hearing. R. 35, 88. She is a high school graduate and attended a year of college. R. 36, 212. Plaintiff is single. R. 182.

Plaintiff lives with her brother, with whom she shares household chores. R. 41-42. Plaintiff dusts around the house, does half of the household cooking, cleans the kitchen, and folds and puts away laundry. *Id*. She is able to do some of her own grocery shopping, but usually brings someone with her due to dizziness from medication. *Id*. Plaintiff relies primarily on public transportation. R. 48-49, 65-66, 74-75.

Plaintiff has not worked since December 24, 2010, when her seasonal job ended and she felt that she could no longer work. R. 36-38, 211. In the past, she has worked as a retail sales person, canvasser, and news assistant. R. 38-40, 67-68, 212, 219.

Plaintiff alleged disability due to bipolar disorder, severe migraine headaches, lower back pain, and adrenal dysfunction. R. 88, 211. She testified to extensive side effects from prescribed medications, including blurred vision, dizziness, sharp pains in her head, and tremors in her hand. R. 42-45, 48, 52-54, 56-57, 63. Plaintiff enjoys reading and writing poetry, but has trouble concentrating and getting started. R. 46-47. She tries to see her friends at least once a week, even when she has a headache or is dizzy. R. 64-65.

**C. Medical Evidence**

**1. Physician and Medical History**

**a. Records of Psychiatrist, Mark Miller, M.D.**

Psychiatrist Mark Miller, M.D., treated plaintiff's depressive symptoms from 2004 until February 2012.  R. 69-70, 371, 384.  Dr.  Miller originally diagnosed plaintiff with depression and prescribed antidepressant medication.   R. 312, 371.

On May 11, 2007, Dr. Miller diagnosed plaintiff with bipolar II disorder after she demonstrated hypomanic symptoms.  R. 312, 371.  He prescribed the mood stabilizing medications Wellbutrin, Lexapro and Lamictal.  *Id*.

Dr. Miller's May 2007 through June 2010 records reflect that plaintiff's mood was mostly stable with treatment.  R. 280-313.  She experienced episodic migraines, nightmares of past trauma, dizziness, and seasonal worsening of her bipolar disorder in the fall.  R. 283, 303, 306, 309, 312.

Plaintiff actively searched for jobs during this period.  She frequently reported her job searching activities to Dr. Miller and expressed frustration with her inability to obtain full-time employment.  R. 280, 283, 286, 289, 292, 297, 300, 306, 309, 312.  Plaintiff also volunteered at the library, practiced yoga, exercised by swimming and walking, wrote poetry, attended cultural events, and spent time with her friends.  R. 280, 294, 297, 300, 303, 306, 309, 312.

On September 5, 2010, plaintiff reported feeling depressed over the past several months. R. 278.  She also complained of a headache that lasted several days.  *Id*.

On October 22, 2010, plaintiff presented with seasonal worsening of her bipolar disorder. R. 272.  Dr. Miller prescribed light therapy, which had worked for plaintiff in the past, and increased her dosage of Wellbutrin.  R. 272, 303.

On December 10, 2010, plaintiff reported improved mood. R. 269. She was excited about her seasonal position at a toy store, but continued to search for permanent employment. *Id*. Plaintiff indicated that she frequently forgot her second dose of Wellbutrin, but she did not want to switch to the long acting form at that time. *Id*.

On April 4, 2011, plaintiff reported that over the past two months she experienced increased depression, oversleeping, anxiety and migraines. R. 266. Dr. Miller noted that plaintiff appeared more depressed, but also had mood reactivity and was able to laugh. *Id*. He considered plaintiff's cognition to be intact and determined that her insight and judgment were fair. *Id*. Plaintiff denied suicidal thoughts. *Id*. She expressed doubt about being able to work part-time, but continued to apply for jobs. *Id*. Dr. Miller discontinued Celexa and added Abilify to plaintiff's medication regimen. *Id*.

On September 9, 2011, plaintiff presented with an improved mood, but complained of side effects, including dizziness, feeling off balance, and sharp pains in her head. R. 380. Dr. Miller lowered plaintiff's dose of Wellbutrin and prescribed Topamax. *Id*.

On October 14, 2011, plaintiff reported recent mood fluctuations and low mood, but she denied suicidal thoughts. R. 381. Dr. Miller added Abilify and discontinued Topamax due to side effects. *Id*.

On November 18, 2011, plaintiff returned to Dr. Miller and complained of increased dizziness. R. 382. Dr. Miller declined to modify plaintiff's dosage of Abilify, which he planned to increase once plaintiff could tolerate the dizziness. *Id*. Dr. Miller considered plaintiff's insight and judgment to be intact and she denied suicidal ideation. *Id*.

On December 30, 2011, plaintiff reported an improvement with her current medication regimen, but declined to increase her dose of Abilify due to stomach issues. R. 383.

On January 13, 2012, Dr. Miller corresponded with plaintiff's attorney. R. 371. He opined that plaintiff was disabled due to depression and adrenal dysfunction. *Id*. She had debilitating symptoms of low energy, lack of stamina, mood fluctuation and recollection of trauma. *Id*. Dr. Miller expected plaintiff's symptoms to last more than twelve months. *Id*.

On February 3, 2012, plaintiff informed Dr. Miller that she wanted to join a comprehensive program of peer support at Mercy Behavioral Health. R. 384. Dr. Miller assessed plaintiff as "somewhat stable" during this final session, but noted that she appeared on the verge of tears. *Id*. Dr. Miller discontinued Abilify due to over sedation. *Id*. He supported plaintiff's decision and prescribed enough medication for her to transition to the desired treatment program. *Id*.

### b. Records of Psychotherapist, Diane Mazefsky, M.Ed.

On September 2, 2010, plaintiff had her first therapy session with psychotherapist Diane Mazefsky, M.Ed. R. 343. Ms. Mazefsky reviewed plaintiff's health history and created a plan for plaintiff to engage in self-care and eventually to begin "creative part-time work." *Id*. They had individual therapy sessions weekly or bi-weekly. *Id*.

On September 9, 2010, plaintiff reported that she felt okay, but also very tired despite increased sleep. R. 339. Ms. Mazefsky speculated that this was typical for plaintiff during autumn. *Id*. Plaintiff discussed her interests with enthusiasm and proclaimed that her self-esteem had improved in recent years. *Id*.

On September 30, 2010, plaintiff informed Ms. Mazefsky that she had been depressed for the past five or six days. R. 335. She indicated that her disorder became worse in the fall. *Id*. Plaintiff also discussed difficulties with her family. *Id*.

On October 13, 2010, plaintiff relayed that she had been depressed for the past few

weeks. R. 333. Ms. Mazefsky noted that plaintiff was self-critical, had long-standing interpersonal issues and a history of shame. *Id*.

On October 28, 2010, plaintiff was feeling much better and enjoying spending time dancing and planning a party with her roommate. R. 331. Ms. Mazefsky advised plaintiff to focus on self-care and acceptance of her challenges with low energy and mood. *Id*.

On November 10, 2010, Ms. Mazefsky and plaintiff discussed self-perception and healthy boundaries. R. 330. Plaintiff stated that her family treated her negatively because of her illness, but she had a good support network of friends. *Id*.

On December 2, 2010, plaintiff reported improved mood and that she was enjoying dancing and going out with friends. R. 329. She was very satisfied with her new part-time job at a toy store. *Id*.

On December 15, 2010, plaintiff presented with improved mood and function. R. 328. Plaintiff liked her new job and was spending time with family and friends. *Id*.

On February 2, 2011, Ms. Mazefsky applauded plaintiff's ability to care for herself and cope with family-induced stress. R. 327. Plaintiff reported that she had finished her temporary job, but was interviewing for two permanent positions. *Id*. Ms. Mazefsky was impressed with plaintiff's zeal and self-assurance. *Id*.

On February 9, 2011, plaintiff reported an improvement from the prior day, when a dream about a past trauma prompted her to call a hotline for support. R. 326.

On February 24, 2011, plaintiff felt positive, but was also experiencing highs and lows. R. 325. She stated that her roommate was a source of support and they enjoyed socializing together. *Id*. Ms. Mazefsky remarked that plaintiff had many constructive methods for self-care. *Id*.

On March 9, 2011, plaintiff reported that she had been depressed for the past two weeks. R. 324. She said that depressive episodes were difficult, but acknowledged that this was typical of her disorder. *Id*.

On March 16, 2011, plaintiff had a depressive episode after her roommate requested that she contribute to the household income. R. 323. She feared that she would have to resume living with her mother. *Id*. Ms. Mazefsky noted that plaintiff was experiencing paralysis due to this threat to her security. *Id*.

On March 24, 2011, plaintiff reported feeling better. R. 322. She had recently interviewed for a part-time retail job. *Id*. She explained that she typically had depressive episodes in March, the month when she was raped and her father's death occurred. *Id*.

On April 4, 2011, plaintiff had her final psychotherapy session with Ms. Mazefsky prior to her transition to Mercy Behavioral Health. R. 321. Plaintiff reported that she felt "good" and continued to apply for jobs. *Id*.

On March 16, 2012, Ms. Mazefsky corresponded with plaintiff's attorney. R. 387-88. Ms. Mazefsky's treatment goals were to make plaintiff as stable and functional as possible. R. 388. Ms. Mazefsky hoped to help plaintiff function at a level that would enable her to maintain employment, but the depressive component of her bipolar II disorder was too debilitating. R. 387-88.

Plaintiff's symptoms included low energy, fatigue, tearfulness, social anxiety and isolation. R. 388. She also had difficulty with accomplishing tasks, completing paper work and leaving home. *Id*. Ms. Mazefsky opined that plaintiff was disabled due to her inability to sustain independence, maintain relationships other than with very close family and friends, achieve financial stability, and secure her own housing. *Id*.

### c. Records of Primary Care Physicians, Dianne Zalenski, M.D. and J. Todd Wahrenberger, M.D.

On June 7, 2011, plaintiff went to Dianne Zalenski, M.D. for an annual physical. R. 360-61. She requested that the results "count an [sic] my physical exam for my SSI claim." R. 361. Plaintiff discussed her depressive symptoms and treatment. *Id.* She explained that she had dealt with depression for thirty-five years, but her symptoms improved since she began taking Lamictal three years ago. *Id.* Dr. Zalenski noted that plaintiff was being treated at the Headache Center for her migraines, which had increased over the past few years. R. 361-62. Plaintiff indicated that headaches, depression and dizziness were interfering with her ability to complete activities of daily living. R. 364-65. She claimed she was disabled by her depression and could not maintain a job. R. 361-62. Dr. Zalenski found that plaintiff was in excellent overall health. R. 361.

On June 4, 2012, J. Todd Wahrenberger, M.D., ordered an MRI to evaluate plaintiff's severe migraines. R. 443. The results of the scan were nonspecific[1]. R. 444.

Plaintiff's attorney did not present additional records from plaintiff's primary care physicians to the ALJ, but did submit records from Dr. Wahrenberger to the ALJ. R. 552-584.

### d. Records of Mercy Behavioral Health Psychiatrist, Dr. Anna Boettcher, and Social Workers Barbara Kline, MSW and Rebecca Blackwood, LSW

On February 21, 2012, plaintiff attended a grief and loss support group directed by Barbara Kline, MSW, at Mercy Behavioral Health ("MBH"). R. 405-06, 478. Ms. Kline noted that plaintiff had depression and complex grief issues and assigned a global assessment of functioning ("GAF") score of 46. *Id.*

---

[1] Plaintiff's attorney did not submit any records from the Headache Center.

On March 16, 2012, Rebecca Blackwood, LSW, conducted plaintiff's initial evaluation. R. 390-96, 408, 445-454, 480. Ms. Blackwood assessed plaintiff's current mental status as normal. R. 392-94, 464, 469-70. Plaintiff discussed how her depressive episodes caused her to feel hopeless and depleted her energy, making it impossible for her to get out of bed or care for herself. R. 54-56, 59, 395, 468, 472. She relied on her best friend for support and coped with her illness by practicing yoga, reading, writing, walking and dancing. R. 395, 472. Plaintiff acknowledged her employment history and family issues. R. 394, 471. She reported moderate difficulty with household chores and routines. *Id.* Plaintiff explained that she had trouble commuting because she had to walk slowly or sit until her dizziness or headache passed. *Id.* Ms. Blackwood assigned a GAF score of 50; plaintiff's highest in the past year. R. 453, 473.

On April 3, 2012, plaintiff attended the grief and loss support group. R. 409, 481. She reported increased migraines. *Id.* Plaintiff also was stressed from living with her mother and being away from her friends. *Id.* Ms. Kline assigned a GAF score of 47. *Id.*

On April 3, 2012, plaintiff also had a therapy session with Ms. Blackwood. R. 410-11, 482-83. She was feeling depressed, but said that therapy improved her mood. R. 410, 482. Ms. Blackwood noted that plaintiff needed to work on her feelings of shamefulness and understanding loss. *Id.* Ms. Blackwood assigned a GAF score of 47. *Id.*

Plaintiff attended therapy sessions with Ms. Blackwood on April 3, 25, 30, May 2, 21, and 22, 2012. R. 410-11, 416-17, 418-19, 424-25, 482-83, 488-89, 490-93, 498-500. Ms. Blackwood's notes from these sessions indicate plaintiff acknowledged the stigma of her mental illness, was stressed by her living arrangements, and had longstanding grief issues due to her father's death. *Id.* Plaintiff acknowledged that her low energy and mood did not correspond with her interests, including dancing. *Id.* She explained that she felt better when she had an activity

or event to look forward to, such as an upcoming arts festival. *Id*. Plaintiff reported increased migraines during this period. *Id*. Ms. Blackwood consistently assigned a GAF score of 50. *Id*. Plaintiff canceled or missed appointments at MBH on April 10, 13, 17, 20, May 7, 11, 14, and 16, 2012. R. 412-17, 484-89.

On May 11, 2012, psychiatrist Anna Boettcher, M.D., performed a psychiatric evaluation of plaintiff. R. 397-99, 421, 495, 524-26. Plaintiff's mood was down and her affect was congruent, but her current mental status was otherwise unremarkable. R. 397-98, 524-25. Dr. Boettcher reviewed plaintiff's history and opined that she was significantly impaired and disabled by her depressive symptoms, which had improved only slightly with therapy and medication. *Id*. She emphasized plaintiff's sporadic employment record and inability to provide for her own needs. R. 397-99, 524-26. Dr. Boettcher diagnosed plaintiff with bipolar disorder, but also wanted to exclude major depressive disorder. R. 399, 526. She assigned a GAF of 30, which she declared plaintiff's highest score in the last year.[2] *Id*. Dr. Boettcher increased plaintiff's dose of Lamictal. *Id*.

On May 30, 2012, plaintiff expressed shock, grief and stress due to her mother's recent hospitalization. She was also stressed by living with her mother and brother and wanted to move out on her own. *Id*. Ms. Blackwood assigned a GAF score of 50. *Id*.

On June 6, 2012, plaintiff related that her mother was near death. R. 428, 504. She was sad and stressed, but Ms. Blackwood assigned an increased GAF score of 55. *Id*.

On June 19, 2012, Ms. Blackwood recommended that plaintiff attend the grief and loss group and assigned a GAF score of 50. R. 432, 509-10. Plaintiff missed or canceled

---

[2] Ms. Blackwood consistently assigned a GAF score of 50 from March 16 through May 22, 2012, plaintiff's highest in the past year. R. 390-96, 408, 410-11, 416-17, 418-19, 424-25, 445-454, 480, 482-83, 488-89, 490-93, 498-500.

appointments at MBH on June 4, 11, 12, 26, 29, and July 3, 2012 due to her mother's illness and death. R. 427, 429-30, 433, 503, 506-07, 511-12, 514-15.

On July 6, 2012, Dr. Boettcher examined plaintiff and corresponded with her attorney regarding her mental ability to perform work-related activities. R. 435-40, 517-18. Dr. Boettcher conceded that she had examined plaintiff only twice, but bolstered her opinion by reviewing plaintiff's medical records and speaking with other treatment providers. R. 405-06, 478.

Dr. Boettcher diagnosed plaintiff with severe, recurrent major depressive disorder without psychotic features and noted that plaintiff had the following symptoms: poor memory; trouble thinking or concentrating; disturbances in sleep, appetite and mood; anhedonia; social withdrawal or isolation; decreased energy; persistent, irrational fears and generalized persistent anxiety; intrusive recollections of past trauma; and suicidal ideation or attempts. R. 439-40. Dr. Boettcher noted that plaintiff did not have any suicidal ideation or side effects from medication. R. 517-18. Dr. Boettcher opined that plaintiff's depressive symptoms rendered her unemployable and would be present for the remainder of her life. R. 435.

Dr. Boettcher, citing plaintiff's inability to maintain employment, assessed plaintiff's ability as "poor" with respect to following work rules, relating to co-workers, dealing with the public, using judgment, interacting with supervisors, handling work stress, functioning independently, and maintaining attention and concentration. R. 437. Dr. Boettcher also determined that plaintiff's ability to understand, remember and carry out job instructions, whether simple, detailed or complex, was "poor" due to her depressive symptoms. *Id*. She assessed plaintiff's ability to maintain her personal appearance as "good." R. 438. Dr. Boettcher considered plaintiff's ability to behave in an emotionally stable manner, to relate predictably in

social situations, and to demonstrate reliability as "fair." *Id*.

Dr. Boettcher concluded that it virtually would be impossible for plaintiff to enter the workforce because she had been "living on the fringe of society for so many years." R. 438. Dr. Boettcher assigned a GAF score of 30, which she indicated was plaintiff's highest in the past year.[3] R. 439.

On July 12, 2012, plaintiff had her last therapy session with Ms. Blackwood before the hearing. R. 522-23. She reported having migraines over the past week. *Id*. She also complained of side effects, including dizziness. *Id*. She mentioned filling out unspecified applications after successfully dealing with her grief issues. *Id*. Ms. Blackwood assigned a GAF of 48. *Id*.

Plaintiff's appointment record from March 6, 2012 through July 12, 2012 demonstrates that plaintiff canceled or missed fifteen of her thirty-three scheduled appointments at MBH. R. 530-31.

### e. Records of State Agency Physician Bruno Petruccelli, M.D., and Psychiatrist Arlene Rattan, Ph.D.

On July 26, 2011, State Agency Physician Bruno Petruccelli, M.D., reviewed plaintiff's medical records. R. 93-94. He determined that plaintiff had no exertional limitations, but she should avoid even moderate exposure to hazards and could never climb ladders, ropes or scaffolds. *Id*.

On August 4, 2011, plaintiff did not show up for a scheduled consultative examination. R. 346-54, 369.

On August 5, 2011, State Agency Psychiatrist Arlene Rattan, Ph.D., reviewed plaintiff's

---

[3] *See supra* note 3 and accompanying text.

medical records. R. 90-92, 94-96. Dr. Rattan found that plaintiff's mental impairments caused

only mild difficulty with activities of daily living and moderate difficulty with respect to social

functions and maintaining concentration, persistence or pace. R. 91. Dr. Rattan opined that

plaintiff was capable of making simple decisions, following through with short and simple

instructions, asking simple questions and accepting instructions. R. 95-96. Dr. Rattan

concluded that plaintiff could sustain the mental demands of employment and recommended a

production-oriented job that required minimal independent decision making. R. 96.

### D. The ALJ's Opinion

After consideration of the above, the ALJ determined that plaintiff could perform a full

range of work at all exertional levels with the following non-exertional limitations:

> [C]laimant cannot climb ropes, ladders or scaffolds; must avoid unprotected
> heights and dangerous machinery; is restricted to unskilled work; requires a low
> stress environment defined as few changes in work settings and no fast pace or
> quota production standards; and can have only occasional contact with the public,
> co-workers, and supervisors.

R. 18. Consistent with the testimony provided by the vocational expert, the ALJ determined that

although plaintiff was unable to perform her past relevant work as a retail sales person, she could

perform the requirements of representative jobs such as private housecleaner, janitor/cleaner,

jewelry stringer, electrical equipment inspector and solderer. R. 25, 77-78. Accordingly, the

ALJ concluded that plaintiff was not disabled through the date of the ALJ's decision. R. 14, 26.

In rendering this residual functional capacity assessment ("RFCA") and determination on

disability, the ALJ reasoned that although plaintiff's bipolar disorder, migraines and low back

pain could reasonably be expected to cause the symptoms alleged by plaintiff, her statements

concerning the intensity, persistence and limiting effects of those symptoms were not credible to

the extent they were inconsistent with the RFCA. R. 19. The ALJ highlighted the absence of

aggressive treatment for plaintiff's lower back pain and the lack of regular treatment for and sporadic nature of plaintiff's migraines. *Id.*

As to plaintiff's mental impairment of bipolar disorder, the ALJ considered plaintiff's testimony regarding her long history of depression and the challenges created by her disorder, including her inability to secure and maintain employment. R. 19. The ALJ also discussed plaintiff's testimony regarding depressive episodes with varying levels of symptoms including memory loss, poor sleep quality, fatigue, and mood fluctuation. *Id.* The ALJ concluded that plaintiff's treatment records, specifically those of Dr. Miller, indicated that she responded favorably to mental health treatment. R. 20-21.

The ALJ declined to assign significant weight to Dr. Miller's January 13, 2012 opinion and Ms. Mazefsky's March 16, 2012 opinion because the reports were conclusory, unsupported by the record, and did not contain a mental RFCA. R. 22. The ALJ also rejected Dr. Boettcher's July 6, 2012 opinion because her findings were inconsistent with the records of plaintiff's other treatment providers. *Id.*

The ALJ gave great weight to the opinions of state agency physicians in evaluating plaintiff's physical and mental limitations, finding that the opinions were consistent with the record. R. 20-21, 23-24.

The ALJ also found that plaintiff's testimony regarding side effects from medications was unsupported by the record. R. 20-22. Finally, the ALJ determined that plaintiff's testimony regarding her symptoms and limitations was inconsistent with her testimony regarding social activities. R. 22.

Plaintiff appealed the adverse decision and thereafter provided the Appeals Council with an additional submission of medical information that had not been presented to the ALJ. R. 532-

739.

On appeal, plaintiff argues that the ALJ's opinion is not based on substantial evidence because (1) the ALJ did not give appropriate weight to Dr. Boettcher's opinion, resulting in a deficient RFCA that fails to account for plaintiff's limitations, and (2) there is substantial evidence to support a finding that plaintiff is disabled.

### III.    STANDARD OF REVIEW

This court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human*

*Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule-making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the

claimant can do his previous work; unless he shows that he cannot, he is
determined not to be disabled. If the claimant survives the fourth stage, the fifth,
and final, step requires the SSA to consider so-called "vocational factors" (the
claimant's age, education, and past work experience), and to determine whether
the claimant is capable of performing other jobs existing in significant numbers in
the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the

Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of
administrative law. That rule is to the effect that a reviewing court, in dealing
with a determination or judgment which an administrative agency alone is
authorized to make, must judge the propriety of such action solely by the grounds
invoked by the agency. If those grounds are inadequate or improper, the court is
powerless to affirm the administrative action by substituting what it considers to
be a more adequate or proper basis. To do so would propel the court into the
domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability

of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.

7 (3d Cir. 2001). Thus, the court's review is limited to the four corners of the ALJ's decision.

## IV. DISCUSSION

### A. New Evidence

Plaintiff's contention that this court should review the additional evidence submitted to the

Appeals Council to determine whether the ALJ's decision is supported by substantial evidence is

contrary to Third Circuit precedent.

With respect to new evidence, a claimant may submit such evidence to the Appeals Council

for consideration so long as it is material to the period of alleged disability under consideration at

the hearing. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001); 20 C.F.R. § 404.970(b). If the

new evidence meets the requirements for review, the Appeals Council can evaluate it with the

prior evidence as a whole to determine if the ALJ's decision was supported by substantial

evidence. *Id.* However, the Appeals Council may decline review if the ALJ's decision is not at

odds with the weight of the evidence of record. *Id.*

Where the Appeals Council denies review, the ALJ's determination becomes final. 42

U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. In such a case, a district court can only review the

evidence upon which the ALJ based his or her decision. *Matthews*, 239 F.3d at 594-95. As a

result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not

within the purview of a district court when judging whether substantial evidence supports the

ALJ's determination. *Id.*

A district court is not bound by regulation when reviewing an ALJ's decision, but is instead

bound by the Act. 42 U.S.C. § 405(g) states that a "court shall have power to enter, upon the

pleadings and transcript of record, a judgment affirming, modifying, or reversing a decision of

the Commissioner." *Matthews*, 239 F.3d at 594 (citing *Jones v. Sullivan*, 954 F.2d 125, 128 (3d.

Cir. 1991) ("Because [the] evidence was not before the ALJ, it cannot be used to argue that the

ALJ's decision was not supported by 'substantial evidence'")). A district court should not,

therefore, directly consider new evidence, but instead should remand for consideration "by the

forum which is entrusted by the statutory scheme for determining disability vel non." *Matthews*,

239 F.3d at 594.

In order to remand, however, a claimant must make an appropriate request and showing.

*Matthews*, 239 F.3d at 592. The claimant needs to satisfy three requirements. *Id.* at 594. First,

the additional evidence must be "new," in the sense that it is not cumulative of pre-existing

evidence on the record. *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). Second, the new evidence must also be "material," meaning that: it is relevant to the time period and impairment(s) under consideration; it is probative; and it is reasonably possible that such evidence would have changed the ALJ's decision if presented earlier. *Id.* Third, "good cause" must be shown for not submitting the evidence at an earlier time. *Id.* The court demands these three requirements be satisfied to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews*, 239 F.3d at 595 (citing *Szubak*, 745 F.2d at 834). These requirements seek to assure that all material evidence is presented to the ALJ as soon as possible. *Id.* at 594-95.

Plaintiff's assertion that this court should consider the evidence submitted only to the Appeals Council in reviewing the ALJ's decision is unavailing. Here, the Appeals Council denied plaintiff's request for review and thus, declined the opportunity to consider new evidence. When the Appeals Council refused plaintiff's request for review, the ALJ's determination became final, which generally and precludes this court from reviewing additional evidence.

Moreover, plaintiff had ample opportunity to develop the record fully before the ALJ. The ALJ questioned counsel to ensure that the record was complete. R. 35, 80-84. Plaintiff's counsel explained that some of Ms. Mazefsky's records may be missing, but told the ALJ that he believed the record was complete. R. 83-84. The majority of the records submitted to the Appeals Council are from Mercy Behavioral Health and Dr. Wahrenberger. R. 552-737. At the hearing, the ALJ specifically requested records from Dr. Wahrenberger, but plaintiff's counsel submitted only a single record. R. 81, 443-44.

Further, plaintiff has failed to make the showing necessary for a remand. Plaintiff has made no attempt to demonstrate that the evidence is new and not duplicative. The additional

evidence consists of records from Mercy Behavioral Health, plaintiff's primary care physician, Westmoreland Case Management & Support, an opinion from another physician, Dr. William Conforti. R. 532-739. Plaintiff does not explain how this evidence is novel or how it would enhance the existing record. The record is not replete with records from Dr. Wahrenberger, but plaintiff has not shown how those records, or any of the additional records, would further develop plaintiff's claim. Dr. Conforti's opinion is arguably cumulative considering that plaintiff submitted opinions from Dr. Miller, Ms. Mazefsky and Dr. Boettcher for the ALJ's consideration. Similarly, the records from Mercy Behavioral Health are also duplicative.

Plaintiff also cannot establish that the additional evidence is probative and would have likely influenced the ALJ's decision. The majority of the new evidence is comprised of records from the ten months after the hearing and is not relevant to the period at issue. It is also unclear how the additional evidence, which was created years after plaintiff's alleged onset date and months after the hearing, would have been influential in making the ALJ's determination.

Finally, plaintiff cannot establish good cause for not presenting the additional evidence to the ALJ. Specifically, plaintiff claims that Dr. Conforti's opinion was unavailable at the time of the hearing. However, Dr. Conforti's April 16, 2012, opinion is dated nearly four months before the hearing. Plaintiff's counsel did not request that the ALJ afford him additional time to submit Dr. Conforti's opinion. Given this state of affairs the record does not warrant a remand for the ALJ to consider the additional evidence.

### B. Treating Physicians

Plaintiff's contention that the ALJ should have given great weight to the opinions of her treating physicians is misplaced. The ALJ gave appropriate weight to the findings and assessments of plaintiff's treating physicians where they were supported by the objective

information in their respective treatment records and rejected the limitations imposed where they were unsupported or sufficiently undermined.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984). It equally is well settled that the ALJ retains the discretion to assign "more or less weight [to such a report] depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429. Where the record contains additional medical evidence that contradicts or undermines a treating physician's assessment, the ALJ retains discretion to assign an appropriate level of weight to each assessment and resolve the conflicting evidence. *See Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985) ("in light of this conflicting medical evidence, the [ALJ] could reasonably find the lack of clinical data, indicating active phlebitis, outweighed the testimony of Newhouse and her treating physicians."). Accordingly, an ALJ may properly assess the credibility of medical opinion evidence and may give little or no weight to internally inconsistent or unsupported opinions. 20 C.F.R. § § 404.1527(c)(2), (d)(4), 416.927(c)(2).

The ALJ assigned minimal weight to Dr. Miller's January 13, 2012 report and to Ms. Mazefsky's March 16, 2012 report. The ALJ acknowledged the treating relationship plaintiff had with Dr. Miller and Ms. Mazefsky, but gave their opinions limited weight because they were were conclusory, unsupported by their respective treatment records, and did not contain a mental RFCA that assessed plaintiff's specific abilities.

Dr. Miller and Ms. Mazefsky's opinions that plaintiff had disabling symptoms of low energy and stamina were inconsistent with their treatment records, which reflected that plaintiff was mostly stable with treatment and engaged in high levels of activity. As the ALJ noted, treatment records from 2007 through early 2012 reflect that plaintiff's mood was managed by medications and was mostly stable under Dr. Miller's care. R. 20. Throughout this period, plaintiff expressed frustration regarding job opportunities, but she actively searched for employment and participated in activities, including volunteering at the library, attending poetry readings, writing, and doing yoga. *Id*. Plaintiff did report seasonal depression in the autumn of 2010 and 2011, but her symptoms responded to light therapy and medication adjustments. R. 20-21. The ALJ interpreted Dr. Miller and Ms. Mazefsky's opinions as suggesting that plaintiff could not function outside of a hospital environment, despite only one in-patient hospitalization in 2005. Dr. Miller did not note any deep episodes of depression or hypomania and consistently found that plaintiff's cognition was intact and there were no reports of suicidal ideation. R. 20. The ALJ accounted for plaintiff's low energy and stamina by limiting her to unskilled work that did not require intense focus. R. 23-24.

The ALJ noted that Dr. Miller and Ms. Mazefsky, who had treated plaintiff long-term, were in the best position to provide a mental RFCA that assessed plaintiff's specific abilities, but they failed to include this in their respective reports. Instead, plaintiff relied on Dr. Boettcher, who had seen plaintiff only twice, to provide a mental RFCA.

The ALJ rejected Dr. Boettcher's July 6, 2012 opinion in its entirety because Dr. Boettcher's findings were inconsistent with records from other treatment providers who had treated plaintiff for a long period of time. Dr. Boettcher opined that plaintiff's depressive symptoms had improved only slightly with therapy and medication, but the records from Dr.

Miller and Ms. Mazefsky reflect that plaintiff was mostly stable with treatment. The ALJ emphasized the lack of a long-term treating relationship between plaintiff and Dr. Boettcher and noted that Dr. Boettcher's limited relationship would not give her more reliability than a state agency physician. Despite rejecting Dr. Boettcher's report in its entirety, the ALJ accounted for Dr. Boettcher's limitations by restricting plaintiff's interaction with others.

Similarly, the ALJ gave minimal weight to plaintiff's GAF scores from 30 to 50 assigned from February through July 2012 because these scores represented a limited time period and did not correspond with treatment notes from 2007 to early 2012, which reflect that plaintiff was mostly stable while under the care of Dr. Miller. R. 22.

In assessing plaintiff's physical limitations, the ALJ gave great weight to the opinion of state agency physician Dr. Bruno Petruccelli, finding that his opinions were consistent with the medical evidence. R. 19-20. The ALJ acknowledged that none of plaintiff's treating physicians suggested more restrictive physical limitations. R. 20.

Similarly, the ALJ gave great weight to the opinions of state agency psychological consultant, Arlene Rattan, Ph.D., in assessing plaintiff's mental limitations. The ALJ reasoned that Dr. Rattan provided specific reasons for her imposed limitations and demonstrated that her opinion was supported by and consistent with the record. R. 21, 23-24.

It was within the ALJ's discretion to disregard plaintiff's treating physician's conclusions that plaintiff was disabled. In general, an ALJ does not have an unwavering obligation to accept a treating physician's opinion of disability because the ultimate determination of disability is reserved to the Commissioner. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007) ("An ALJ need not defer to a treating physician's opinion about the ultimate issue of disability because that determination is an administrative finding reserved to the

Commissioner.").

**C. Plaintiff's Credibility**

The ALJ appropriately assessed plaintiff's credibility regarding her subjective complaints of symptoms, limitations and side effects from medication. Although plaintiff does not specifically allege that the ALJ erred in finding her not entirely credible, plaintiff's brief recites her testimony at length and asserts that her claims, and presumably her testimony, are consistent with the records from her treatment providers.

In evaluating a plaintiff's limitations, an ALJ must accord subjective complaints the same treatment as objective medical reports, in that he must weigh all the evidence before him and explain his or her reasons for crediting and/or rejecting such evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). In doing so serious consideration must be given to subjective complaints where a medical condition exists that could reasonably produce such complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). When medical evidence provides objective support for the subjective complaint, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)).

The record contradicts plaintiff's contention that she was not mentally or physically capable

of looking for work after she was released from her seasonal job.  R. 36-38, 67, 211.  Although plaintiff claimed she was unable to work or continue her job search as of December of 2010, she frequently reported to her treatment providers that she was looking for work before and after her alleged onset date.  The record reflects that plaintiff clearly understood her position was seasonal.  She continued to seek full-time employment, while she was working at her temporary job and in the months that followed.  Plaintiff was still looking for work as of July of 2012.

Plaintiff alleges that she was depressed while working in the temporary position and her depression increased after the job concluded.  But she did not report depressive episodes in December of 2010.  In fact, the record indicates that plaintiff consistently reported improved mood.  She was very pleased with her job and enjoyed spending time with her friends.

Similarly, the record does not reflect that plaintiff experienced increased depression during the months after her onset date.  And even assuming she did have increased depression, her symptoms were not serious enough for her to seek treatment until February of 2011, two months after her onset date.  At that time, plaintiff reported that she continued to look for work and her therapist commended her ability to care for herself and cope with stress.  In March of 2011, around the time of plaintiff's application, plaintiff's roommate requested that she contribute to the household finances which in turn triggered a depressive episode.  Despite this, plaintiff continued to apply for jobs.  She did not seek treatment from Dr. Miller, who could have treated plaintiff's increased depression, until April of 2011.  R. 266.  In other words, the treatment records do not reflect that plaintiff had increased depression around the time of her onset date or directly after she lost her seasonal position.

The ALJ's finding that plaintiff's testimony regarding her symptoms and limitations did not correspond with her testimony regarding activities, including household chores and leisure

activities, is supported by substantial evidence. R. 22. Plaintiff's testimony also did not support a finding that she suffered disabling limitations in the activities of daily living, social functioning, or concentration, persistence and pace. *Id.*

Plaintiff's testimony and treatment records reflect that plaintiff symptoms did not interfere with her ability to perform the activities of daily living or prohibit her from living an active social life. Plaintiff testified to three types of "typical" days, with varying levels of depressive symptoms, but there is no indication that plaintiff's depressive symptoms were disabling. Plaintiff testified that she shared household chores with her brother and that she was able to endure a bus ride up to four hours round trip. Plaintiff frequently expressed a desire to her treatment providers to live independently, reflecting that she considered herself capable of meeting her own needs.

Plaintiff maintained an active social life throughout her alleged period of disability. She testified about her numerous hobbies, including reading, writing, poetry, dancing, attending cultural events and socializing with friends. R. 46-47, 67. She testified that she tries to see her friends at least once a week, despite having a headache or feeling dizzy. R. 64-65. The opinions authored by her treatment providers, Dr. Miller, Ms. Mazefsky, and Dr. Boettcher, rely on plaintiff's symptoms of low energy and stamina and an inability to maintain employment to establish disability. Although plaintiff did have periods of low energy and stamina, the record clearly demonstrates that plaintiff is capable of caring for herself and maintaining an active level of social functioning. It follows that plaintiff is able to engage in work-related activities consistent with the RFCA rendered by the ALJ.

The ALJ reviewed plaintiff's testimony regarding side effects from her medications and determined that the record did not support her allegations. R. 20-22. Plaintiff testified to a

variety of side effects, including dizziness, falling down, headaches, sharp pains in her head, blurry vision, tremors in her hands, drowsiness and decreased concentration. R. 42-46, 48, 53-54, 63. Plaintiff attributed many of these to Lamictal and Wellbutrin, mood-stabilizing medications that she has taken since 2007 and continued to take at the time of the hearing. R. 43, 45, 53, 63.

Plaintiff did report side effects on a few occasions. She complained of balance and dizziness to Dr. Miller, who addressed these issues by adjusting her Wellbutrin dosage. She also reported side effects, including dizziness, from Abilify and Topamax, but these issues were resolved by discontinuing those medications. In the last treatment record prior to the hearing, plaintiff reported that she had side effects from unspecified medications, including dizziness. The ALJ noted that the record did not reflect that she had requested medication modifications based on side effects and plaintiff's treatment providers did not impose any activity restrictions based on side effects. R. 21.

Because the ALJ's decision contained a discussion of the record and other factors that persuasively undermine plaintiff's subjective complaints of symptoms and resulting limitations, the ALJ did not err in finding plaintiff's subjective complaints were not fully credible. *Mason*, 994 F.2d at 1067-68. The record contained substantial evidence to support the ALJ's assessment of the medical evidence of record as a whole and plaintiff's subjective complaints. Accordingly, the Commissioner's decision must be affirmed.

## V. CONCLUSION

It is well-settled that disability is not determined merely by the presence of impairments, but by the effect that the impairments have on an individual's ability to perform substantial gainful activity. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). In making assessments of the impact impairments have on a particular individual's ability to do work related activities,

determinations of credibility are committed to the sound discretion of the ALJ and must be upheld where there is substantial evidence to support them. *Hartranft*, 181 F.3d at 362. Here, the record contained substantial evidence to support the ALJ's assessment of the medical evidence of record as a whole and plaintiff's subjective complaints. Accordingly, the Commissioner's decision must be affirmed.

For the reasons set forth above, plaintiff's motion for summary judgment will be denied, the Commissioner's motion will be granted and final judgment will be entered in favor of the Commissioner and against Plaintiff. Appropriate orders will follow.

Date: February 10, 2015

Lisa Pupo Lenihan
United States Magistrate Judge